# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

UNITED STATES OF AMERICA                                                  PLAINTIFF

v.                              NO. 4:10CR00055 JLH

ANTHONY GENE MAYS                                               DEFENDANT

## OPINION AND ORDER

Anthony Gene Mays was indicted, tried, and convicted on each of three counts: possessing a firearm after previous felony convictions in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); attempting to kill an officer of the United States while the officer was engaged in and on account of his official duties in violation of 18 U.S.C. §§ 1111 and 1114; and the use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii). The Court sentenced Mays to 120 months on Count One, 240 months on Count Two to run consecutive, and 120 months on Count Three to run consecutive to Counts One and Two, for a total of 480 months. Mays appealed. His lawyer filed a no merit brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967), and the Eighth Circuit affirmed.

Mays has now filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. He asserts three grounds for relief. He contends that his lawyer on appeal was ineffective for failing to argue that the government did not prove the *mens rea* required for conviction under 18 U.S.C. § 1114; that his trial lawyer was ineffective for failing to investigate the firearm that he was indicted for possessing; and that his trial lawyer was ineffective for failing to move for a judgment of acquittal on the attempted murder charge. The first and third grounds present substantially the same issue: whether the lawyers representing Mays at trial and on appeal were ineffective for failing to challenge the sufficiency of the evidence to prove that he had the

specific intent necessary for a conviction of attempted murder. Accordingly, the Court will consider the first and third grounds together before addressing the second ground.

Ordinarily, to prevail on a claim of ineffective assistance of counsel, a defendant must show that his lawyer's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). Proving that the lawyer was deficient "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689, 104 S. Ct. at 2065. Because of the distorting effects of hindsight and the difficulty of viewing counsel's representation of the client from the perspective available to defense counsel at the time of trial, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id*. Proving that the deficient performance prejudiced the defense requires a showing that there is a reasonable probability that, but for defense counsel's mistakes, the result of the proceeding would have been different. *Id*. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id*. In determining whether there is a reasonable probability that but for counsel's mistakes the result would have been different, the court must consider the totality of the evidence. *Id*. at 695, 104 S. Ct. at 2069.

Whether Mays can show that his lawyers were ineffective for not challenging the sufficiency of the evidence on the issue of whether he had the specific intent necessary for a conviction on the attempted murder charge requires consideration of the intent requirement for that charge, as well as

the standard for reviewing the sufficiency of the evidence when a motion is made for a judgment of acquittal in a criminal case. The Court instructed the jury:

> The crime of attempting to kill an officer of the United States as charged in Count 2 of the indictment has four elements, which are: One, the defendant unlawfully attempted to kill Rick Yopp; two, the defendant did so with malice aforethought; three, the attempt was premeditated; and, four, Rick Yopp was attempted to be killed while engaged in his official duties as an officer of the United States.

Tr. at 203. On the specific intent element, the Court instructed the jury as follows:

> As used in Instruction No. 11, malice aforethought means an intent, at the time of an attempt to kill, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life; but malice aforethought does not necessarily imply any ill will, spite or hatred toward the individual attempted to be killed.
>
> In determining whether Rick Yopp was unlawfully attempted to be killed with malice aforethought, you should consider all of the evidence concerning the facts and circumstances preceding, surrounding, and following the – that should say the attempted killing which tend to shed light upon the question of intent.
>
> An attempt to kill is premeditated when it is intentional and the result of planning or deliberation. The amount of time needed for premeditation of an attempt to kill depends on the person and the circumstances. It must be long enough for the defendant after forming an intent to kill to be fully conscious of his intent and to have thought about the killing. For there to be premeditation, the defendant must think about the taking of a human life before acting. The amount of time required for premeditation cannot be arbitrarily fixed. The time required varies as the minds and temperaments of people differ and according to the surrounding circumstances in which they may be placed. Any interval of time between forming the intent to kill and acting on that intent, which is long enough for the defendant to be fully conscious and mindful of what he intended and willfully set about to do, is sufficient to justify the finding of premeditation.

Tr. at 205-06. No objection was made to these instructions at trial, nor does Mays now contend that the instructions were improper or that his lawyers were ineffective for failing to object to them.

As to the standard for reviewing a motion for judgment of acquittal, the Eighth Circuit views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor

3

of the government, and giving the government the benefit of all reasonable inferences that may be drawn from the evidence. *United States v. Holm*, 836 F.2d 1119, 1122 (8th Cir. 1988). The jury, not the court, has the duty and the authority to resolve conflicts in the testimony and to judge the credibility of witnesses. *United States v. Weaver*, 554 F.3d 718, 721 (8th Cir. 2009). Accordingly, a verdict of guilty will not be overturned based on credibility determinations. *Id.*; *United States v. Cole*, 380 F.3d 422, 425 (8th Cir. 2004). A guilty verdict will be overturned only if no reasonable jury could conclude that the government has proven all of the elements of the crime beyond a reasonable doubt. *Id*.

Mays was living in Elkhart, Indiana, in April of 2009, but he was in Blytheville, Arkansas, on April 4, 2009. At approximately 10:00 a.m., that day, he entered the home of a 90-year-old man named Jimmy Lunsford, struck Lunsford in the head, and stole $118 from him.[1] There was also evidence that he stole a gun–a .38 caliber Taurus, five-shot pistol–from Lunsford.

Rick Yopp is a special agent with the United States Department of Agriculture; he is a federal law enforcement officer. His mother lives next door to Lunsford. On the morning of April 4, 2009, Yopp was performing chores for his mother in his mother's yard. He had a brief verbal exchange with Mays on the sidewalk and saw Mays go into Lunsford's carport. He also saw Mays after Mays emerged from Lunsford's house and was walking away from it. After Mays left the scene, Yopp went to Lunsford's house, knocked on the door, and entered, whereupon he found Lunsford after Lunsford had been assaulted and robbed. Yopp then retrieved his personal firearm, got in his pickup truck, and drove through the streets of Blytheville looking for Mays.

---

[1] At trial Mays contested the sufficiency of the evidence identifying him as the person who robbed Lunsford and shot at Yopp, but he does not do so in his habeas petition.

After Mays left Lunsford's house, he went to the home of a man named Frank Hatcher and requested that Hatcher give him a ride to a gas station that also served as a Greyhound bus station. Hatcher was reluctant to give Mays a ride because he did not know him and because he saw that he was carrying a pistol, which Hatcher identified as a "sharpnosed" .38 caliber pistol, but he nonetheless agreed to give Mays a ride to the station. Before Hatcher and Mays could leave the premises, however, Yopp arrived and used his pickup truck to block Hatcher's vehicle so that the Hatcher vehicle could not leave. Yopp identified himself as a federal law enforcement officer, showed his badge, and demanded that Hatcher and Yopp raise their hands and exit from Hatcher's vehicle. Hatcher complied, but Mays did not.

According to Yopp, Mays sat and listened as Yopp identified himself and ordered Mays to show his hands. After some time, Mays slid across from the passenger's side of Hatcher's vehicle to the driver's side and then stepped out backwards, facing Yopp. Tr. at 61. Yopp ordered Mays to show his hands, and Mays moved his right hand but kept his left hand out of Yopp's sight. Yopp repeated the order, with the same result. After some time, Mays ran around to the front of the Hatcher vehicle and then to the side of or behind the house, out of Yopp's sight. Several minutes passed. Yopp concluded that Mays had jumped the fence and left the scene, so he started to drive around the block. Before Yopp could leave, however, Mays reappeared. Tr. at 61-62.

When Mays reappeared, according to Hatcher, he "started shooting the pistol at the FBI" (which was his description of Yopp). Tr. at 23. Hatcher did not remember at trial how many shots Mays fired, but he knew that Mays emptied the pistol while firing at Yopp. Tr. at 23. According to Hatcher, the bullets started hitting "the walkway." Tr. at 23. Hatcher did not say where "the walkway" was that the bullets hit.

5

Yopp described the shooting incident in more detail than did Hatcher. According to Yopp, when Mays reappeared, "He raised his left hand[2] and fired his first shot at me." Tr. at 62. Yopp got out of his pickup, took cover behind the wheel and motor at the front end of his pickup, and aimed at Mays. In less than a minute or two, Mays raised his left hand again and fired a second shot "in my direction." Tr. at 62. After another minute or two had passed, Mays "raised his – left hand again and fired a third shot at me in my direction, and I'm looking at him face to face." Tr. at 63. According to Yopp, he and Mays were less than thirty feet apart when these shots were fired. Tr. at 63. Then, Mays again fled around the side of or behind the house, and Yopp again thought that Mays had climbed the fence and left the scene. Again, however, according to Yopp, Mays emerged after several minutes, "raised his left hand again with the pistol on it and shot at me a fourth time." Tr. at 64. A few seconds later, Mays raised his left hand again, pointed the weapon at Yopp, and shot for the fifth time. Tr. at 65. Yopp recognized from the distance that the pistol was a revolver, but he assumed that it was a six-shot revolver, so he thought Mays had one more bullet to fire. Yopp testified that Mays fired "five shots at me." Tr. at 65. Mays then jumped a fence and disappeared. Tr. 65.

Mays was later arrested in Elkhart, Indiana. The evidence showed that Mays left Blytheville on a Greyhound bus early in the afternoon on April 4, 2009, traveling to Elkhart. *See* Tr. at 93-95, 144-45; Gov't Ex. 2-A, 2-B, 2-C, and 2-D.

Hatcher and Yopp were the only eye witnesses to the shooting incident other than Mays, but three witnesses testified that Mays told them about the events of April 4, 2009. Paul Sims, with whom Mays was living in April of 2009, testified that Mays told him that he "busted a federal

---

[2] The evidence established that Mays is lefthanded. Tr. at 141.

6

agent." Tr. at 36. When asked what Mays said about busting a federal agent, Sims testified "he just said he—just running and busting at him. That's what he said. Said, 'I was running and shooting.'" Tr. at 37. Sims also testified that Mays told him that he had hit and robbed an old man. According to Sims, Mays said that he had stolen a gun from the old man. Tr. at 37.

Andre Sain, with whom Mays shared a cell for some time during his pretrial detention, testified that Mays told him that he had robbed an old man, taking $118 and a .38 Taurus. Sain testified as follows:

> Q. And did he tell you were he might have gone after this incident [robbing the old man] occurred?
>
> A. Well, the first time he told me, he was walking. Then somebody pulled up. He got to shooting. Then another time, he told me he was in the vehicle. He jumped out and shooting. Told me two different things.
>
> Q. All right. And so who did he say was doing the shooting?
>
> A. He said he was shooting.
>
> Q. Did he tell you who he was shooting at?
>
> A. He described him as being a food stamp man.[3]
>
> Q. A food stamp man?
>
> A. Yes, ma'am.
>
> Q. Okay. And did he make any comments about – other than what you've talked about here about shooting, did he make any comments about the shooting?
>
> A. Well, he just described saying he was ducking behind a truck like a blue truck.
>
> Q. Okay. Did you all talk about the fact that Mr. Mays had missed the agent?

---

[3] One of Yopp's duties as a special agent of the United States Department of Agriculture is investigating food stamp fraud.

> A. Yes.
>
> Q. And tell us about that.
>
> A. He just said he hoped he wouldn't miss.
>
> Q. Who hoped –
>
> A. Mr. Mays told me he hoped he wouldn't have missed.

Tr. at 104.

The third person who testified that Mays told him about the events in question was Roy Powell, who for a time was incarcerated in the same cell block as Mays during Mays's pretrial detention. Powell testified that Mays told him that he had stolen a .38 Taurus revolver from the victim and that "he shot at the officer." Tr. at 120. He also testified as follows:

> Q. Did he make any other comment to you about missing the agent?
>
> A. About missing the agent? We laughed, kind of joked. I was, like – how do you – he said he fired, like, five times. And I was, like, "how did you miss him? How was there no evidence? How did you miss him and the truck?" He was, like, "I don't know." He didn't make any other comments after that. It was like after he fired, the agent took over, and he took off running.

Tr. at 122-23.

It is well settled that criminal intent, including intent to commit murder, can be proven by circumstantial evidence. *United States v. Waldman*, 310 F.3d 1074, 1078 (8th Cir. 2002); *United States v. Warbonnet*, 750 F.2d 698, 700 (8th Cir. 1984); *United States v. Wisdom*, 534 F.2d 1306, 1309 (8th Cir. 1976). The jury here could conclude from all of the circumstances beyond a reasonable doubt that Mays specifically intended to kill Yopp. The evidence established that Mays fired a total of five shots on two different occasions at Yopp after having had ample opportunity to decide whether to fire at Yopp, surrender, or flee. Mays and Yopp had a confrontation when Yopp

pulled his pickup truck in a position to block Hatcher and Mays from leaving Hatcher's premises. Yopp ordered both Hatcher and Mays to raise their hands and move away from the vehicle. Hatcher complied, but Mays did not. After some time, Mays slid across the seat of Hatcher's vehicle and exited backwards, facing Yopp, and refusing to raise his left hand even though he was ordered to do so. Again after some time, Mays fled around the house and out of sight. He was out of sight for several minutes—long enough for Yopp to conclude that he had climbed the fence and fled. After those several minutes, Mays emerged from around the house and faced Yopp at a distance of less than thirty feet. He fired three shots at Yopp before fleeing around the house again. He was gone several minutes again before he re-emerged for his third confrontation with Yopp at the Hatcher premises. After re-emerging, he fired two more shots at Yopp, which emptied the gun—a five-shot .38 Taurus revolver. After ample opportunity for deliberation, Mays fired a lethal weapon at Yopp and did so repeatedly—until he had no more bullets to shoot. The jury was entitled to infer that Mays intended to kill Yopp.

The testimony of Sims, Sain, and Powell as to what Mays told them about the incident confirms that Mays was shooting at Yopp and intended to hit him. Sims testified that Mays said he was "busting at" the agent. Sain testified that Mays told him that he was shooting at a "food stamp man" and that he had hoped that he would not miss. Powell testified that Mays told him that "he shot at the officer" and that he did not know how he could have missed him. Mays did not simply shoot in the general direction of Yopp; he also intended to hit him.

In short, the circumstances were that Mays fired five shots from a five-shot .38 caliber pistol at Yopp from a distance of less than thirty feet. Eyewitness testimony established that Mays was shooting at Yopp. Mays's description of the events to three individuals confirmed that he was

9

shooting at Yopp and intended to hit him. The jury was entitled to find beyond a reasonable doubt that Mays intended to kill Yopp.[4]

Mays's argument to the contrary relies heavily on his interpretation of the opinion in the Supreme Court in *Braxton v. United States*, 500 U.S. 344, 111 S. Ct. 1854, 114 L. Ed. 2d 385 (1991). Braxton pled guilty to assault on a deputy marshal and use of a firearm during a crime of violence but not to a third charge—attempted murder of a deputy marshal. As a part of his plea colloquy, he stipulated that when United States marshals came to his door, contemporaneous with the door opening, a gunshot was fired through the door opening and that the gunshot lodged in the

---

[4] Because *Braxton v. United States* holds that 18 U.S.C. § 1114 "does not specify the elements of 'attempt to kill,' they are those required for an 'attempt' at common law[.]" *Braxton*, 500 U.S. 344, 351 n.*, 111 S. Ct. 1854, 1859 n.*. Therefore, opinions addressing whether sufficient evidence supported a finding of "intent to kill" are instructive even if the decisions do not involve a prosecution pursuant to 18 U.S.C. § 1114. *See Hudson v. Lafler*, 421 Fed. App'x 619, 626-27 (6th Cir. 2011) ("The defendant's threats during the robbery, use of a deadly weapon, and the fact that he carried out his threats and shot at the victim are all facts from which a rational factfinder could reasonably infer the requisite [specific intent to kill]."); *Cooper v. Lafler*, 376 Fed. App'x 563, 570 (6th Cir. 2010) (firing a firearm multiple times from short range and causing a wound); *Garnes v. Lamarque*, 306 Fed. App'x 374, 376 (9th Cir. 2009) (previous physical altercations, pointing firearm at victim, saying "yeah, you," and firing at the victim); *United States v. Mann*, 241 Fed. App'x 165, 167 (4th Cir. 2007) (statements about going to victim's house to "shoot up the place"); *Puckett v. Costello*, 111 Fed. App'x 379, 383 (6th Cir. 2004) (firing firearm at apartment in which rivals were known to live and outside of which someone was seen at the time of the shooting); *United States v. Owens*, 20 Fed. App'x 785, 788 (10th Cir. 2001) (pointing loaded firearm at victim and telling him to "get out of the car."); *United States v. Cooper*, 210 F.3d 386, 2000 WL 32069 (9th Cir. 2000) (Table) ("we find that [a specific] intent to kill may be inferred from [the defendant's] act of shooting in the direction of the witness."); *Pena v. Lewis*, 166 F.3d 1218, 1998 WL 894599 (9th Cir. 1998) (Table) (testimony that defendant pointed and fired firearm sufficient to establish intent to kill despite testimony which supported a contrary conclusion); *Salley v. State*, 303 Ark. 278, 796 S.W.2d 335 (1990) (sufficient evidence of attempted murder where appellant pointed firearm at an officer, fired once, missed, and fired two more shots at the officer while he was on the ground); *Scott v. State*, 303 Ark. 197, 200 (1990) ("Evidence of the manner in which deadly weapons are used may be sufficient to justify a jury's conclusion that the defendant had a deliberate intent to kill."); *Abdullah v. State*, 301 Ark. 235, 237-38, 783 S.W.2d 58, 59-60 (1990).

front door just above the doorknob. The district court sentenced Braxton as though he had been convicted of attempted murder, to which he had not confessed guilt. The government argued that the stipulation was sufficient to show that Braxton had shot at a marshal and therefore attempted to kill him, but the Supreme Court found that the stipulation was ambiguous because it contained apparently contradictory statements—that Braxton had fired through the door and that he had hit the door. Braxton claimed that he intended to frighten the marshals, not shoot them, and the Supreme Court concluded that that claim was consistent with the stipulation. The Supreme Court decided that the stipulation did not establish that Braxton had attempted to murder one of the marshals.

*Braxton* is not on point. Mays cites Hatcher's testimony that bullets were hitting the walkway, which Mays contends proves that he shot into the ground in front of him rather than at Yopp. While Hatcher testified that the bullets were hitting the walkway—wherever the walkway was—he also testified that Mays was shooting at Yopp. As noted, Yopp testified that Mays was shooting at him. In addition, Mays, himself, told three different persons that he shot at Yopp (or words to that effect). In *Braxton*, the court was confronted with a stipulation that said apparently contradictory things. Here, there was no stipulation. Assuming for the sake of argument that Hatcher's testimony was inconsistent, the jury was entitled to believe all of what Hatcher said, part of it, or none of it. Tr. at 199. And assuming that Hatcher meant to say that the bullets were hitting the walkway in such a way as to show that Mays was shooting into the ground, not at Yopp, the jury was entitled to disbelieve that testimony in the face of other testimony, not only from Yopp but also from Hatcher, himself, that Mays was shooting at Yopp. *See United States v. Saborit*, 967 F. Supp. 1136, 1140 (N.D. Iowa 1997) (citing over a dozen Eighth Circuit opinions holding that "if the

evidence reasonably supports two contrary theories, the reviewing court must not disturb the jury's determination.").

Mays's lawyers were not ineffective for failing to challenge the sufficiency of the evidence on the issue of whether Mays had the requisite intent to kill Yopp. The argument that the evidence was insufficient to support the jury verdict on that point is without merit. It was not ineffective for the lawyers to decline to raise an argument that had no merit, nor did it prejudice Mays for his lawyers to fail to raise that argument. Had they raised the argument, the argument would have been unsuccessful.

Mays's other ground for relief is his assertion that his trial lawyer failed to investigate the firearm that he was indicted for possessing. The indictment charged that Mays, having previously been convicted of felonies, knowingly possessed a firearm, which is specifically identified in the indictment as a .38 caliber Taurus, serial No. KB81202. As noted above, there was evidence that Mays assaulted and robbed Lunsford, taking $118 and a firearm. Lunsford had a book in which he kept information regarding firearms that he owned. His book included information that he owned a .38 Taurus, serial No. KB81202. Lunsford testified that the .38 Taurus was a five-shot revolver that he kept in a sock in the nightstand next to his bed. He also testified that after he was assaulted on the morning of April 4, 2009, he went to his nightstand and discovered that the .38 Taurus was gone.

The .38 Taurus bearing serial No. KB81202 was discovered by the Corning, Arkansas, Police Department on September 16, 2009, in the possession of Randall and Yvonne Hill. Randall Hill was a felon; Yvonne Hill was his wife. According to the Hills, Randall had purchased the firearm from Kenneth Upchurch, a co-worker at L.A. Darling in Paragould, Arkansas, approximately two weeks

before the date the gun was discovered by the Corning Police Department. Upchurch in turn said that he purchased the gun on September 1, 2009, from Keith Floyd, also a co-worker at L.A. Darling. The incident report by Detective Long of the Blytheville Police Department says, in pertinent part:

> I spoke with Upchurch and he stated he purchased the gun on September 1 for $175.00 from Keith Floyd, a co-worker at L.A. Darling and he sold the gun to Randall Hill on September 3 for $185.00. Upchurch stated Floyd approached him and offered to sell the gun and claimed he needed money for bills due to his mother being in the hospital. Upchurch stated he asked Floyd how long [he] had owned the gun and Floyd stated, "2 or 3 years." Upchurch asked Floyd from whom he purchased the gun and Floyd stated, "I bought it from a guy." Upchurch stated he requested Floyd to complete a Bill of Sale. A copy of the Bill of Sale is attached with this report. Upchurch stated he is currently a federal firearms dealer.
>
> I contacted L.A. Darling in Paragould, AR, to request that current address and telephone number of Christopher Keith Floyd and was informed to report in person so they could verify my identity then I could have the information. [Document #48 at p. 46.]

Mays has submitted an affidavit in which he says that he requested that his lawyer, Assistant Federal Public Defender Omar Greene, interview Floyd to see if he had any paperwork to show that he possessed the firearm at the time the indictment charged that he possessed the firearm. He also says in his affidavit that he requested Greene to speak with Officer Long to see if he had followed up on his investigation and actually interviewed Floyd. Mays says that Greene assured him that he would do those things, but on the day that the trial started he learned that Greene had not investigated the gun at all.

The government has submitted an affidavit from Greene with its response to Mays's habeas petition. Greene's affidavit says, in pertinent part:

> In preparation for trial, Mr. Mays mentioned two issues about the pistol that was the subject of Count One of the Indictment. First, he said that the government had altered the serial number of the pistol that the government introduced into evidence during the proceedings in this case. He said the government altered the serial number, so it would match the serial number of the pistol that a robbery victim,

13

Jimmy Lunsford, had reported as stolen. Mr. Lunsford reported and testified under oath (in a video deposition to which the parties consented) that an assailant stole the pistol during an attack and robbery upon Mr. Lunsford at Mr. Lunsford's home on April 4, 2009.

Defense counsel and Defender's Investigator Shawn Tobin, who possesses considerable knowledge about firearms, inspected the pistol. Mr. Tobin photographed it. There did not appear to be any tampering with or alteration of the serial number. Counsel concluded that there was no need to investigate this matter further and that time and resources could be better spent on pursuing a suppression hearing and on other trial preparation.

The second pistol-related issue involved statements made to police after police recovered the stolen pistol in September 2009. Police recovered the pistol from Yvonne and Randall Hill, a married couple. The husband, Randall Hill, said that he bought the pistol from a co-worker, Kenneth Upchurch. According to Hill, the co-worker, Upchurch, said he bought the pistol from a man named Christopher Keith Floyd. Mr. Hill said that Upchurch said that Floyd said he (Floyd) had the pistol in his possession for "two or three years" before he sold it to Upchurch.

Concerning Mr. Floyd, Chief Defender Investigator Floyd Hancock attempted to locate him, but Chief Investigator Hancock was not able to make contact with Mr. Floyd. Chief Investigator Hancock also reported that "the police never located him (Christopher Floyd) last I knew." Recently, Chief Investigator Hancock learned that Mr. Floyd supposedly resides in Marmaduke, AR, but there is no address or telephone number available for him through the sources that Chief Investigator Hancock checked.

Thus, the allegation that Greene did not investigate the gun is untrue. The chief investigator for the public defender's office, Floyd Hancock, attempted to locate Christopher Keith Floyd but was unable to do so. Hancock also reported that the police had not found Christopher Keith Floyd.

Moreover, the evidence at trial conclusively established that Mays had in his possession on April 4, 2009, the .38 Taurus, serial No. KB81202. Lunsford owned a .38 Taurus bearing that serial number, which he had recorded in his book where he recorded the serial numbers of his guns. He kept the .38 Taurus bearing that serial number in a sock in a nightstand next to his bed. After he was assaulted, he checked the nightstand and found that the gun was missing. Mays was positively

14

identified as the person who had assaulted Lunsford. Shortly after assaulting Lunsford, Mays went to Hatcher's house, and Hatcher saw him in possession of a "sharpnosed .38" pistol. The evidence established that the .38 Taurus owned by Lunsford was a five-shot revolver, and he kept it loaded with five bullets. Later in the morning after Lunsford was assaulted and robbed, Mays fired five bullets at Yopp using the weapon described by Hatcher as a "sharpnosed .38." Hatcher testified that he did not count the shots but he was aware that Mays had emptied the revolver shooting at Yopp. Yopp was not aware that Mays had emptied the revolver, but he did count the shots, and he counted five shots. Mays, himself, told Sims that he had stolen a gun from the old man whom he had robbed; told Sain that he had robbed an old man, taking $118 and a .38 Taurus; and told Powell that he had stolen a .38 Taurus from the victim of his robbery. In the face of this evidence, the likelihood that Floyd could have produced evidence to show that he actually was in possession of the .38 Taurus, serial No. KB81202, on April 4, 2009, is nil. The fact that Upchurch told police that Floyd told him that he had owned the gun for two or three years hardly makes it probable that Floyd had possessed the gun for two or three years. The gun was stolen. The police were investigating a stolen gun; they found a felon in possession of it. The fact that a man who purported to be a federal firearms dealer, who had received the stolen gun, and who had sold it to the felon, reported to the police that the person from whom he received the stolen gun told him that he had owned the gun for two or three years is unsurprising—but there is no evidence that it was true. In fact, we know where that gun was late in the morning of April 4, 2009: it was in Mays's left hand.

The allegation that Greene did not investigate the gun is false. His investigator attempted to interview Floyd but was unable to find him. *Cf. Helmig v. Kemna*, 461 F.3d 960, 967 (8th Cir. 2006) (no ineffective assistance where counsel "only failed to call witnesses who would not provide

15

a defense, were not credible, or could not reasonably be located"). Assuming, for the sake of argument, that Greene made no effort to interview Floyd, there is no reasonable probability that the outcome of the case would have been different had Floyd been interviewed about his possession of the gun. Mays can prove neither element of the *Strickland* test.

## CONCLUSION

For all of these reasons, the motion of Anthony Gene Mays to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 is denied. Document #48. Mays has not made a substantial showing of the denial of a constitutional right, so no certificate of appealability will issue.

IT IS SO ORDERED this 23rd day of September, 2011.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE